## TUTTLE v. LEITER.

(Circuit Court, N. D. Illinois.    October 13, 1897.)

1. LANDLORD AND TENANT—COVENANT TO PURCHASE IMPROVEMENTS—SUBLETTING AND ASSIGNMENT.

On November 1, 1865, A. leased certain premises to plaintiff and his intestate from that date "for and during and until" July 1, 1885. The lessees covenanted to build on the premises, and the lessor agreed at the expiration of the term "to purchase the improvements erected upon said premises at an appraised valuation for material for building purposes." The lessees agreed not to remove any buildings or improvements, except for rebuilding, without consent, and to insure, and that the rent should be a lien on buildings and improvements that might at any time be erected, etc. The lease was duly recorded. The lessees entered and erected a building. Thereafter they transferred a term to L., H. & L. from April, 1870, "for and

during and until" July 1, 1885; reserving rent to themselves, and guarantying the insurance money, in case of fire, to L., H. & L., for rebuilding. They also gave to L., H. & L. the right to alter and improve, and to elect to buy the improvements on the same terms named in the original lease, and thereupon to acquire the rights of the original lessees in that respect against the lessor. The instrument provided that at the end of the term the premises should be delivered up to the original lessees, who also reserved a right of re-entry for nonpayment of rent. Subsequently L., H. & L. transferred to H. H. The building was destroyed by fire. H. H. then transferred to the Bank of C., which, receiving $2,000 insurance money, erected a $30,000 building, and later transferred to W. On April 10, 1878, the interest and reversion of the original lessor was conveyed to defendant. At the expiration of the term, suit was brought on behalf of .the original lessees against defendant to recover for the material in the $30,000 building. *Held*, that the improvements mentioned in the original lease comprehended the improvements existing at the end of the term.

2. SAME.

*Held*, further, that if, as would seem to be the case, the transfer from the original lessees was a subletting, and not an assignment, it did not shut off their right to recover the value of the improvements under the lease.

3. SAME.

*Held*, further, that, if that transfer was an assignment, yet the obligation of the original lessor to pay for improvements was a charge on the reversion, and that the covenant creating this charge was not assigned.

4. SAME.

*Held*, further, that, whether the transfer to L., H. & L. was an assignment or a sublease, defendant was bound by the obligation to pay for the improvements.

Wm. P. Black and Joseph N. Barker, for complainant.
Isham, Lincoln & Beale, for defendant.

SHOWALTER, Circuit Judge. On the 1st day of November, 1865, Anne G. Turnbull leased to Augustus C. Shelton and Byron Tuttle a certain parcel of land on Madison street, in Chicago. The lessees were to have and to hold the same from the 1st day of November, 1865, "for and during and until the first day of July," 1885. The rent was $500 for the first year, and $800 for each year thereafter. This lease, which was under seal, and was duly recorded in the recorder's office of Cook county, Ill., contained the following provision:

"The said party of the second part [the lessees] further covenants to build and erect upon said premises good and substantial brick buildings, as soon as it can reasonably be done; and at the expiration of the term the said party of the first part [the lessor] agrees to purchase the improvements erected upon said premises at an appraised valuation for material for building purposes."

It was further provided that the rent reserved should be a—

"Lien upon any and all buildings and improvements on said premises, or that may at any time be erected, placed, or put on said premises by the said party of the second part, their heirs, executors, administrators, or assigns, and upon his or their interest in this lease and the premises hereby demised."

The lease contained also the following provision:

"It is further agreed by the party of the second part that they will, and their heirs and assigns shall, keep the buildings to be erected upon said premises fully assured by a responsible insurance company, and assign the policy or policies of insurance to the said party of the first part, to be held as collateral security for rent of said premises."

Also the following:

"And the said party of the second part further agrees not to remove any buildings or other improvements from said premises, except for the purpose of rebuilding, without written consent of said party of the first part."

Shelton & Tuttle entered under this lease, and erected a building on the premises at a cost of about $7,000. On the 1st day of April, 1870, Shelton & Tuttle made an instrument, in the form of a lease, whereby they transferred to William Lewis, Charles H. Ham, and Joseph B. Lewis a term in said premises from the 1st day of April, 1870. "for and during and until the first day of July," 1885. In this instrument the rent reserved was $3,500 per annum, payable quarterly. The stipulation concerning insurance in the original lease was referred to in the instrument of April 1, 1870, and then came the following provision:

"The party of the first part [Shelton & Tuttle], and their heirs and assigns, shall, in accordance with the above-recited clause, in case of destruction or damage by fire of said premises, guaranty to said party of the second part the full benefit of all money recovered from such insurance, for the purpose of rebuilding said premises."

This second instrument contained also the following provision:

"It is further agreed by the party of the first part that, whereas it is provided in the lease of said premises from Anne G. Turnbull to said party of the first part as follows: 'And at the expiration of the term the said party of the first part agrees to purchase the improvements erected upon said premises at an appraised valuation for material for building purposes,'—said party of the second part shall have the right to alter and improve the building upon said premises at any time during the continuance of said term, but solely at their own expense; and said party of the first part hereby agrees that said party of the second part may at any time during the continuance of this lease elect to buy from said party of the first part the improvements on said premises belonging to said party of the first part, upon the terms provided in said lease from Anne C. Turnbull to said party of the first part, namely, for their appraised valuation for material for building purposes: provided that, should said party of the second part so elect, said party of the first part shall be released from any liability to said Anne G. Turnbull, her heirs and assigns, to keep said buildings insured from such time forward: and provided, further, that, in case of such election and purchase, said party of the second part shall be substituted to all the rights of the party of the first part by reason of the clause in the lease from said Anne G. Turnbull to said party of the first part binding said Anne G. Turnbull to purchase any improvements standing upon the premises at the expiration of said lease at the appraised valuation for material for building purposes."

This instrument provided that at the end of the term the premises were to be delivered up to Shelton & Tuttle. It also provided that, in case the rent were not paid, Shelton & Tuttle might sell out all the interest in the premises of the party of the second part, or might themselves re-enter.

Lewis, Ham & Co. entered under the foregoing writing. On the 23d day of September, 1870, they assigned whatever estate had been thereby transferred or created to H. H. Honore; and on the 5th day of January, 1872, Honore assigned to the National Bank of Commerce of Chicago. In the meantime, and on or about the 9th of October, 1871, the building was destroyed by fire. Shelton & Tuttle collected $2,000 of insurance money, and turned the same over to the National Bank of

Commerce; and that concern thereupon erected the building which now occupies said premises, at a cost of $30,000. Later the bank assigned to one Whitney, who held for the residue of the term. On the 10th of April, 1878, the executor and trustee and the heirs of Anne G. Turnbull, who had in the meantime died, conveyed all the interest and reversion vested in Anne G. Turnbull at the time of her death to the defendant Levi Z. Leiter. Shelton & Tuttle paid the rent at all times in accordance with the requirements of the original lease. The term, as has already been said, expired on the 1st day of July, 1885. This suit is brought by Tuttle, in his own right and as representing the estate of Shelton, now deceased, to recover for the material in the present building, by virtue of the provisions of the original lease above quoted.

It does not appear that Shelton & Tuttle, after they had erected the original building on the premises, and the same had been destroyed by fire, were bound to rebuild, but they certainly had the right to rebuild if they saw fit. By the terms of the lease, Shelton & Tuttle, in case they should rebuild, could not remove the structure so erected. Such second building would become part of the realty, and, if it still remained on the premises "at the expiration of the term," the reversioner would be bound to pay a sum equal to the value for "building purposes" of the material in such building. Since the building first erected by Shelton & Tuttle was destroyed pending the term, no obligation, so far as the material in that building was concerned, could ever arise as against the reversioner. The language, "at the expiration of the term the said party of the first part agrees to purchase the improvements erected upon said premises at an appraised valuation for material for building purposes," comprehends improvements on the premises "at the expiration of the term." The court is not authorized to narrow the scope of the covenant, and make it apply only to the "brick building" which Shelton & Tuttle obligated themselves to erect in the first instance. It is the grammatical import of the words of the covenant, and the spirit of the entire instrument, that the value for building purposes of the material in whatever improvements were on the land on July 1, 1885, should be paid by the reversioner. If Shelton & Tuttle continued to occupy the premises, and had themselves erected the present building, it seems to me that the obligation to pay them for the material in that building would be clear.

It is said, however, that the instrument of April 1, 1870, was in law an assignment of the entire leasehold estate, and not a subletting, that it was by a subsequent agreement between the reversioner of the first leasehold and an assignee under the second instrument that the present building was erected; and that Shelton & Tuttle, since the second instrument was an assignment and not a subletting, have no right whatever as against the reversioner. From the recitals quoted above, it will be seen that the terms of the indenture of April 1, 1870, were very different from those of the original lease. The right to be paid for the building material was expressly reserved, as was also the right on the part of Shelton & Tuttle to themselves receive the possession of the premises at the end of the term. Within the law, as stated in 1 Washb. Real Prop. (at pages 543–546), the instrument of April 1, 1870,

would seem to be a subletting, rather than an assignment. Such was evidently the clear intent of the parties. Following out the terms of that instrument, the premises would be surrendered on the 1st day of July, 1885, to Shelton & Tuttle, by their tenant, and afterwards, and on the same day, if need be, by Shelton & Tuttle to the reversioner under the old lease. On this view, there was neither privity of estate nor privity of contract between Mr. Leiter and Mr. Whitney, the latter having been simply the assignee of a sublease. The old term created by the first lease would thus have remained outstanding in Shelton & Tuttle. So far as concerns Leiter, the case was precisely the same as though Shelton & Tuttle themselves had never made any sublease, but had remained in possession of the property, and erected thereon the present building. The successors to the original lessor, on this theory, mistook the situation, in undertaking to deal with the National Bank of Commerce and with Whitney. The bank and its successor, Whitney, held only that estate which had been created by Shelton & Tuttle in the writing of April 1, 1870. They had no power to vacate, alter, or release the old covenant here in question. The provision of the original lease that Shelton & Tuttle were to be paid for the material in the building at the close of the term, assuming that such provision was incidental to the leasehold estate, remained unassigned and unimpaired. The second lease here refers to, and was made subject to, the first. There is no difficulty in understanding that the possession was to be surrendered by the second lessees on July 1, 1885, so that Shelton & Tuttle could afterwards, even on that day, surrender to Leiter. The logic of the case does not demand that the intent of the contracting parties to make a sublease be disregarded. In Stewart v. Railroad Co., 102 N. Y. 602, 8 N. E. 203, there was a writing whereby a term of 50 years was first created, followed by an agreement to sell the reversion to the lessee on certain terms. If this agreement were kept, then there never could be any re-entry by the party of the first part. The lessee made its original entry as well under the contract of purchase as under the lease. This contract and all interests under it passed to an assignee. The latter thereupon made a 99-year lease to the defendant. The court ruled that the defendant was an assignee of the 50-year term, since no reversion out of that term could have remained in the first assignor. The doctrine which complainants' counsel contend for here is recognized by Judge Rapallo in the following language:

"Neither can the covenant to surrender have any bearing. It was a covenant to surrender at the expiration of the ninety-nine years lease, long after the expiration of the fifty years lease. Where, in an assignment of a lease, or in a demise by the lessee for the same term as that granted by the original lease, there is a covenant to surrender to the assignor, this has in some cases been held to prevent the sublease from operating as an assignment; but this has been because the whole instrument, taken together, has been held to reserve to the original lessee some fragment of the original term, though almost inappreciable in point of duration, as in the case of Post v. Kearney. 2 N. Y. 394, where the assignee of a lease demised the premises for the residue of his term, reserving the right to a delivery of possession by his assignee to him on the last day of the term, and a right to intermediate possession in case the buildings should be destroyed by fire. These reservations were held sufficient to characterize the demise as a sublease, and not an assignment. The right to pos-

session on the last day would leave a fragment of that day of the term in the assignor, and was sufficient to create a technical reversion, and thus prevent a privity of estate between his lessee and the original lessor."

The dissenting opinion in the foregoing case went apparently on the ground that the initial contract, as a whole, was really not a lease; that the money paid under the name of rent was really part of the price of the property, and, since there was really no term for 50 years, there could be no reversion following such term, wherefore the 99-year lease was a sublease, and not an assignment of the alleged 50 years' term. In the present case the obligation to pay for the material in the building could not arise until the 20-year term expired. This obligation was rather a charge on the reversion than an incident to the leasehold estate. There might have been an assignment of the leasehold, leaving the reversion charged with the covenant in favor of Shelton & Tuttle. Clearly, they did not assign this covenant, even if they did assign the leasehold. I doubt, therefore, if the question of assignment be material here. On this view, Leiter, even if he had not expressly assumed the obligation, took the reversion subject to the charge, and with full notice of the same.

In the suggestion that the claim of complainant is inequitable, defendant's counsel forget that complainant and Shelton owned the 20-year term. The property increased rapidly in value, but complainant and Shelton were entitled to all the benefits of this increase. They controlled also the building right. They were careful to observe the advantage given by the terms of their lease, in the requirement that the lessor or her successors must pay a sum equal to the value of the building material on the ground when the lease expired.

I think the exceptions to the master's report, other than the fifth, should be sustained. The master has found the value of the building material to be $5,673. I see no reason to criticise this finding, and a decree may go for this amount.